**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| Alexander G. Castillo, (M37131), | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Case No. 19 C 50251 |
| v. | ) | |
| | ) | Hon. Iain D. Johnston |
| | ) | |
| Stephanie Dorethy, Warden, | ) | |
| Hill Correctional Center, | ) | |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM OPINION AND ORDER**

Petitioner Alexander G. Castillo, a prisoner at the Lawrence Correctional Center, brings this *pro se* habeas corpus action pursuant to 28 U.S.C. § 2254 challenging his first-degree murder and home invasion convictions from the Seventeenth Judicial Circuit Court, Winnebago County, Illinois. (Dkt. 1.) The Court denies the petition on the merits and declines to issue a certificate of appealability.

## I.      Background

The following facts are drawn from the state court record, (Dkt. 33.) including the Illinois appellate court's opinions. A state court's factual findings are presumed correct in a federal habeas corpus proceeding unless Petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Hartsfield v. Dorethy*, 949 F.3d 307, 309 n.1 (7th Cir. 2020) (citations omitted); *Hall v. Zenk*, 692 F.3d 793, 805 (7th Cir. 2012). Petitioner has not set forth any evidence to rebut this presumption.

### A.      Petitioner's Trial

Following a jury trial, Petitioner was convicted of two counts of first-degree murder and

two counts of home invasion. *People v. Castillo*, 2015 IL App (2d) 130515-U, ¶1 ("*Direct Appeal*"). The evidence presented at trial established the following events.

In the early morning hours on May 10, 2010, Petitioner murdered Christa Clark and her husband, Michael, in their home in Rockford, Illinois. *Direct Appeal,* ¶3. Christa's seven-year-old son, A.B., and infant daughter, Ani, were present in the home at the time of the murders. *Id.* A.B. was awoken by the sound of gunshots and saw Petitioner shoot Christa. *Id.* at ¶¶4-5. The boy picked up a cellphone that he found and unsuccessfully tried to call a family friend, Jack Buttita. *Id.* at ¶5. Buttita did not answer because he did not recognize the phone number that had a Wisconsin area code of 608. *Id.* at ¶6. Buttita later told detectives that he tried dialing the number after he learned about Michael and Christa, and his call went to a voicemail for someone named Alex. *Id.* It was determined that the number was assigned to Petitioner's cellphone. *Id.*

Having failed to reach Buttita, A.B. went to the home of his neighbor, David Saunders, and informed him that a friend of Christa's had shot and killed his mom and stepdad. *Id.* at ¶3. Saunders contacted the police. *Id.* A.B. and his sister were transported to SwedishAmerican Hospital. *Id.* at ¶¶4, 6.

Rockford police officer, Melissa Sundly, spoke to A.B. at the Saunders' home and at the hospital. *Id.* at ¶4. A.B. told Sundly the shooter was a friend of Michael and Christa's named "Blizz." *Id.* He described Blizz as a white male, around eighteen or twenty years old, who lived in Wisconsin and drove a red car or black truck. *Id.* The victim's son saw Blizz look through Christa's pockets for money after shooting her. *Id.*

Rockford detective, Kevin Nordberg, also spoke with A.B. at the hospital. *Id.* at ¶5. A.B. told Nordberg that he saw Blizz point a gun at Christa and pull the trigger. *Id.* The boy's

2

explanation of the events was consistent with what he told Sundly—adding that he saw money lying near Christa after she was shot. *Id.* He did not recognize the cellphone he used to call Buttita, but believed it belonged to Blizz. *Id.* According to A.B., Blizz lived in Janesville, Wisconsin. *Id.*

Nordberg and Detective John Eissens showed A.B. a photo lineup. *Id.* at ¶7. Before presenting it, Nordberg explained the lineup may not include a photo of the suspect and told A.B. that he was not obligated to make an identification. *Id.* A.B. pointed to a photograph of Petitioner and stated, "'That's Blizz.'" *Id.* Blizz was discovered to be the name of another individual, Jeremy Haynes, who lived in Rockford, Illinois. *Id.* at ¶5. When shown a photo of Haynes, A.B. identified him as Blizz, but explained he was not the man he had seen in his home. *Id.* at ¶10.

Police arrested Petitioner on the afternoon following the murders in Janesville after leaving the home of Josie Cook, Petitioner's girlfriend at the time and the mother of his daughter. *Id.* at ¶9; *see also People v. Castillo*, 129 N.E.3d 551, 554 (Ill. App. Ct. 2019) (*"Post-Conviction Appeal"*). At the time of his arrest, Petitioner was driving a Pontiac Sunfire. *Post-Conviction Appeal*, 129 N.E.3d at 554-55. The cellphone that A.B. used to call Buttita was found in the vehicle. *Id.* at 555. A blue Oldsmobile with a piece of cardboard covering the rear license plate was found parked in Cook's driveway. *Id.* The Oldsmobile matched the description of the vehicle reported by the Clarks' neighbor, Steven Peterson, who testified that he heard loud metal banging noises and saw an individual running toward a car that had its engine running at the time of the murders. *Id.* at 553-54. Although Peterson did not know what type of car it was, he said it looked like an "Oldsmobile 88 or Cutlass from the 1980s." *Id.* at 554.

In an interview with detectives following his arrest, Petitioner stated he owed Christa $3,450.00 and had driven the Oldsmobile to the Clarks' home around 12:30 a.m. on the morning

of the killings to repay her. *Id.* at 555. Petitioner explained that Christa had been texting him all day and had been making various threats. *Id.* Text messages recovered from Michael's cellphone revealed the following messages were sent to Petitioner the day before the murders: "'I'm on my way to your house;' 'We don't have any money to get home;' and 'You don't call my wife right now. I'm going to punch you in the face, promise.'" *Direct Appeal*, ¶8. According to A.B., Michael and Christa had traveled with him and his sister to Petitioner's apartment complex the day before the murders. *Id.* at ¶11. Petitioner explained to the police during his interview that he initially avoided going to the victims' home because he was worried another individual, "Spanky," would be there. *Post-Conviction Appeal*, 129 N.E.3d at 555. When he arrived, however, Michael told him he had nothing to worry about. *Id.* Petitioner told police he left the residence a little after 1 a.m. on the morning of the killings. *Id.*

When the police questioned him about how A.B. was able to gain access to his phone, Petitioner at first denied that it was possible. *Id.* Petitioner later explained he left his cellphone at the victims' home and returned about fifteen minutes later to retrieve it, at which time he observed that Christa and Michael had been shot. *Id.* Despite placing himself at the scene of the crime shortly after the murders, Petitioner asserted his innocence to the police, but conceded he fled from the scene and did not try to get help for the victims. *Id.*

At trial, A.B. identified Petitioner in open court as the individual who shot Christa. *Id.* He knew Petitioner from Michael and Christa's wedding and from the trip to Petitioner's apartment complex the day before the murders. *Id.* The boy understood that he did not have to select a photo when the detectives showed him the lineup. (Dkt. 33-14, pg. 368.) At the time of the shooting, A.B. saw the side of Petitioner's face when he stood up and turned to go out the door, and he

recognized Petitioner's short hair in the lineup. (*Id.* at pgs. 181, 369-371.) Although A.B. thought Blizz was Petitioner's name when he spoke with the police, he later learned that was incorrect. (*Id.* at pg. 374-75.) Other evidence established Haynes (the "real" Blizz) had a gold Cadillac and black and gray Chevy Suburban at his address, as opposed to a small red car or black truck, (Dkt. 33-14, pgs. 187-188, 240) and his hair was shaved. (Dkt. 33-12, pg. 1480.)

Detective Monica Heatherington testified for the defense regarding her interview with A.B. in May 2010. *Direct Appeal,* ¶14. During the interview, A.B. told Heatherington that he did not see Petitioner's face—just the gun and his hand. *Id.* When asked how he knew Petitioner was the shooter, the boy responded, "Because they—when I went to the hospital, they showed me a picture and I—and then, they told me that they, they got him." *Id.* During Detective Eissens' cross-examination, he denied pointing to Petitioner's photo during the lineup and telling A.B., "'they got him.'" *Id.* at ¶8.

David Reimann was called as a witness by the State. *Post-Conviction Appeal,* 129 N.E.3d at 555. Reimann shared a cell with Petitioner in December 2015 while awaiting trial in Winnebago County jail for a pending burglary charge. *Id.* At the time of Petitioner's trial, Reimann was serving a seven-year prison sentence for the charge. *Id.* Althoug they were cellmates, Petitioner confessed to Reimann that he murdered Christa and Michael. *Id.* Petitioner explained to him that he had feelings for Christa and there was a "confrontation" via text messages. *Id.* According to Reimann, Petitioner told him that he went to the victims' home shortly after midnight on the day of the killings but could not gain access. *Id.* He returned two hours later, entered their home, and shot Christa and Michael. *Id.*

Reimann stated he was not provided any consideration in exchange for his testimony. *Id.*

He also acknowledged that shortly before his testimony, he told the prosecutor he suffered from memory problems due to seizures and could not recall his conversation with Petitioner. *Id.* He denied the seizures affected his memory during his testimony. *Id.* Petitioner's attorney attempted to impeach Reimann further by inquiring about the 4- to 15-year sentencing range for his burglary charge to show that his seven-year sentence was lenient and that it went to bias. *Id.* at 555-56. The trial court barred counsel from asking Reimann about his sentencing range. *Id.* at 555.

Following his trial and conviction, Petitioner was sentenced to natural-life prison terms for each of the murder convictions to run concurrently. *Id*. at 553. Petitioner was also sentenced to a 51-year prison term for the home-invasion convictions. *Id.* The term was to run consecutive to the sentences for first-degree murder. *Id.*

### B. Petitioner's Direct Appeal

On direct appeal, Petitioner argued trial counsel was ineffective for failing to move to suppress A.B.'s identification as a product of unduly suggestive police procedures, and that the evidence did not support the home invasion convictions. *Direct Appeal*, at ¶2; (Dkt. 33-2, pgs. 2-3.) The appellate court vacated one conviction of home invasion pursuant to Illinois' One-Act, One-Crime doctrine, but otherwise rejected Petitioner's claims and affirmed the remaining convictions. *Id.* at ¶¶24-26. Petitioner filed a *pro se* petition for leave to appeal (PLA), arguing the appellate court incorrectly applied *Foutch v. Bryant,* 459 N.E.2d 958 (Ill. 1984), when resolving his ineffective assistance of counsel claim regarding the failure to bring a motion to suppress A.B.'s identification. (Dkt. 33-4, pg. 5.) The Illinois Supreme Court denied Petitioner's PLA. *People v. Castillo*, 39 N.E.3d 1005 (Ill. 2015); (Dkt. 33-3.)

6

### C.     Petitioner's Post-Conviction Proceedings

Petitioner filed a *pro se* post-conviction petition arguing (1) the trial court improperly limited the cross-examination of Reimann; (2) "other crimes" evidence was erroneously introduced at trial; (3) A.B.'s out-of-court identification of Petitioner was the result of an improperly suggestive process; (4) appellate counsel was ineffective for failing to raise these three issues on direct appeal; and (5) appellate counsel was ineffective for failing to bring a PLA raising the issues presented before the appellate court on direct appeal. (Dkt. 33-5.) The state trial court summarily dismissed the petition on the merits. (Dkt. 33-6.)

Petitioner raised one claim on post-conviction appeal, asserting his appellate counsel was ineffective in failing to appeal the trial court's limitation of the defense's cross-examination of Reimann. (Dkt. 33-7.) The state appellate court affirmed the trial court's summary dismissal. *Post-Conviction Appeal*, 129 N.E.3d at 558. Petitioner's PLA challenged the standard of review under Illinois' Post-Conviction Hearing Act applied to his claim that appellate counsel on direct appeal was ineffective for failing to raise the trial court's limitation of the cross-examination of Reimann. (Dkt. 33-9.) The Supreme Court of Illinois denied Petitioner's PLA, completing the state court proceedings. *People v. Castillo*, 124 N.E.3d 494 (Ill. 2019); (Dkt. 33-10.) Petitioner now brings the instant habeas corpus petition before this Court. (Dkt. 1.)

## II.     Analysis

Petitioner alleges the following claims in the instant habeas corpus petition:

Claim One:     Trial counsel was ineffective for failing to file a motion to suppress A.B.'s identification.

Claim Two:     There was insufficient evidence to support Petitioner's conviction for home invasion.

7

Claim Three:    The trial court violated Petitioner's due process rights by limiting the cross-examination of Reimann at trial.

Claim Four:    The trial court violated Petitioner's due process rights by admitting evidence of "other crimes."

Claim Five:    The circumstances surrounding the pre-trial identification procedures deprived Petitioner of a fair trial.

Claim Six:    Appellate counsel was ineffective for failing to file a PLA asserting the claims raised on direct appeal.

Claim Seven:    Appellate counsel was ineffective for failing to raise the trial court's limitation of Petitioner's cross-examination of Reimann on appeal.

Claim Eight:    Appellate counsel was ineffective for failing to raise the admission of "other crimes" evidence on appeal.

Claim Nine:    Appellate counsel was ineffective for failing to raise the circumstances surrounding the pre-trial identification procedures on appeal.

Claim Ten:    Appellate counsel was ineffective for failing to appeal the use of a videotaped pre-trial statement of Petitioner at trial.

## A.    Procedurally Defaulted Claims

Respondent correctly argues that all claims, with the exception of Claim Seven, are procedurally defaulted, and that Petitioner cannot excuse the default under cause and prejudice, nor fundamental miscarriage of justice. To preserve a claim for federal habeas review, a prisoner must first fairly present the substance of his claims through one full round of state court review, including a PLA before the Supreme Court of Illinois. *O'Sullivan v. Boerckel*, 526 U.S. 838, 842, (1999); *Weaver v. Nicholson*, 892 F.3d 878, 886 (7th Cir. 2018); *Johnson v. Hulett*, 574 F.3d 428, 431 (7th Cir. 2009). Fair presentment requires setting forth the operative facts and the legal principles that control each claim. *Sweeney v. Carter*, 361 F.3d 327, 332 (7th Cir. 2004). To determine whether a constitutional claim has been fairly presented, we consider four factors: "(1)

8

whether the petitioner relied on federal cases that engage in constitutional analysis; (2) whether the petitioner relied on state cases which apply a constitutional analysis to similar facts; (3) whether the petitioner framed the claim in terms so particular as to call to mind a specific constitutional right; and (4) whether the petitioner alleged a pattern of facts that is well within the mainstream of constitutional litigation." *Id.* (quoting *Wilson v. Briley*, 243 F.3d 325, 327 (7th Cir.2001)).

Before turning to Petitioner's procedurally defaulted claims, the Court notes that Respondent concedes that Claim Seven, challenging appellate counsel's performance on direct appeal for failing to raise the trial court's limitation of the defense's cross-examination of Reimann, is properly exhausted. (Dkt. 32, pg. 10.) One could question this concession as Petitioner's PLA on post-conviction review, where Respondent believes Petitioner completed the exhaustion of the issue, attacks the proper standard used to evaluate the claim under Illinois' Post-Conviction Hearing Act, an apparent issue of state law, within the context of the Reimann ineffective assistance of appellate counsel issue. (Dkt. 33-9.) The Court, however, will not explore the exhaustion question as to Claim Seven further because procedural default is an affirmative defense that is subject to forfeiture. *Cheeks v. Gaetz*, 571 F.3d 680, 686 (7th Cir. 2009) (internal quotation marks and citations omitted).

Regardless, the ineffective assistance of counsel issue exhausted in Claim Seven cannot be used to cure the procedural default of the other ineffective assistance of counsel claims in the petition. Although ineffective assistance of counsel is a single claim, *Pole v. Randolph*, 570 F.3d 922, 934 (7th Cir. 2009) (citing *Peoples v. United States*, 403 F.3d 844, 848 (7th Cir. 2005)), Petitioner must raise the particular factual basis for each aspect of the alleged ineffective assistance of counsel allegation to preserve the respective argument. *Id.* at 935 (citing *Stevens v. McBride*,

489 F.3d 883, 894 (7th Cir. 2007)). The failure to present a claim about one aspect of counsel's assistance to each level of state court will result in procedural default. *Stevens*, 489 F.3d at 894. Claim Seven is the only properly preserved claim in this case. The Court now turns to an individual evaluation of the defaulted claims.

### 1. Claim One: Ineffective Assistance of Trial Counsel for Failing to Challenge A.B.'s Identification.

Respondent is correct that Petitioner's claim that trial counsel was ineffective for failing to file a motion to suppress A.B.'s identification is procedurally defaulted. Petitioner raised the claim before the state appellate court on direct appeal. (Dkt. 33-2, pg. 15.) However, despite Petitioner's argument to the contrary, (Dkt. 37, pg. 8.) he failed to properly preserve the claim via his direct appeal PLA. The PLA addresses an unrelated matter of Illinois' standard for adjudicating a claim when counsel fails to present a proper record on appeal and discussed *Foutch v. Bryant*, 459 N.E.2d 958 (Ill. 1984), a civil case involving resolving an appeal when there are gaps in the record. (Dkt. 33-4, pg. 5.)

It is true that Petitioner mentions his claim from the state appellate court, (Dkt. 33-4, pg. 4.) and cites *Strickland v. Washington*, 466 U.S. 668 (1984), and *United States v. Kennedy*, 372 F.3d 686 (4th Cir. 2004). (Dkt. 33-4, pg. 5.) The crux of his argument, however, is focused on the application of *Foutch*, which does not include any constitutional analysis, and is framed around his counsel's failure to provide a complete record on appeal. (Dkt. 33-4, pg. 2, 5-6.) The direct appeal PLA does not otherwise discuss counsel's failure to file a motion to suppress beyond mentioning the issue was raised on direct appeal. (Dkt. 33-4, pg. 4.)

Petitioner's PLA failed to exhaust his instant claim of ineffective assistance of trial counsel for failing to move to suppress A.B.'s identification, as the "operative facts and controlling legal

principles" of that claim were not put before the Supreme Court of Illinois. *Sturgeon v. Chandler*, 552 F.3d 604, 610 (7th Cir. 2009) (internal quotation marks and citations omitted). It is clear that a wholly different claim regarding record preservation and Illinois' legal standard on the issue were presented in the PLA. Petitioner's "mere passing reference" in his PLA to the claim that trial counsel was ineffective in failing to move to suppress is insufficient to exhaust it. *Id.* Petitioner is not merely reformulating the same claim between the state appellate court and PLA proceeding. Instead, he impermissibly raised a new and different claim. Petitioner also did not properly preserve this claim in his post-conviction proceedings. Accordingly, the claim is procedurally defaulted.[1]

### 2. Claim Two: Insufficient Evidence to Convict.

Petitioner seeks habeas relief on the ground that there was insufficient evidence to convict him of home invasion. (Dkt. 1, pg. 6.) Petitioner contends his entry was not unlawful because he was invited into the Clarks' residence to repay a debt and left thereafter. *Id.* Like Claim One, this claim was raised before the appellate court on direct appeal, (Dkt. 33-2, pg. 24.) but not in the

---

[1] Beyond the procedural default, Petitioner's claim would be meritless. The state appellate court on direct appeal, the last state court to adjudicate the ineffective assistance of counsel claim on the merits, explained that the "got him" statement was not evidence of a suggestive identification, but instead an attempt by the questioning detective to clarify A.B.'s statement as the two appear to have been "talking past one another" at one point during the interview. *Direct Appeal*, ¶16. Petitioner provides no argument to demonstrate that this is an unreasonable determination of fact, thus dooming any merits argument. 28 U.S.C. § 2254(d)(2).

For the sake of argument, even if the state court's determination was objectively unreasonable and the out-of-court identification was improperly suggestive, Petitioner would still be unable to demonstrate that the appellate court's rejection of his ineffective assistance of counsel claim was contrary to, or an unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984). *See* 28 U.S.C. § 2254(d)(1). Petitioner cannot demonstrate prejudice under *Strickland*, as the *Neil v. Biggers*, 409 U.S. 188 (1972) factors counsel for the reliability of A.B.'s in-court identification of Petitioner even if hypothetically the out-of-court identification is found suspect. There is also overwhelming evidence of Petitioner's guilt beyond A.B.'s identification testimony, including the fact that A.B. used Petitioner's phone to call for help immediately after the shooting and Petitioner was later arrested with his phone, suggesting Petitioner was in the home at the time of the murders. Petitioner's own statement to the police placed him in the home close to the time of the killings, an eyewitness saw a car matching Petitioner's fleeing the scene, and the victims' text messages demonstrate Petitioner and the victims had an apparent disagreement in the hours leading up to the murders. Petitioner also confessed to this jail cellmate.

direct appeal PLA. (Dkt. 33-4.) It was also not properly preserved through the postconviction proceedings. Thus, this claim is procedurally defaulted.

### 3.    Claim Three:    Cross-Examination of Reimann.

Claim Three argues the trial court deprived Petitioner of a fair trial in limiting the defense's cross-examination of Reimann. (Dkt. 1, pg. 7.) Petitioner did not raise Claim Three on direct appeal, (Dkt. 33-2) and he failed to present it to the Illinois appellate court and Supreme Court of Illinois during post-conviction proceedings. (Dkt. 33-7; Dkt. 33-9.) Thus, the claim is procedurally defaulted.[2]

### 4.    Claims Four and Eight: "Other Crimes" Evidence and Ineffective Assistance of Appellate Counsel.

Claims Four and Eight relate to the admission of "other crimes" evidence at trial, specifically evidence of Petitioner's prior speeding ticket that he received while driving a red Toyota. (Dkt. 1, pg. 7.) According to Petitioner, this evidence was used to corroborate A.B.'s statement to Detective Nordberg that the shooter drove a small red car or a large black truck. (Dkt. 37, pg. 31.) As for Claim Four, Petitioner asserts the trial court deprived him of his due process right to a fair trial when the court admitted this evidence. (Dkt. 1, pg. 7.) As for Claim Eight, Petitioner asserts his appellate counsel was ineffective in failing to raise this claim on direct appeal. (Dkt. 1, pg. 8.) Both claims are procedurally defaulted, as neither claim was raised on direct appeal,

---

[2] It is true that Petitioner properly exhausted an ineffective assistance of counsel claim for failing to raise the limitation on the cross-examination of Reimann on direct appeal (Claim Seven). However, it is clear that Petitioner never raised this freestanding claim before the state court, resulting in the instant procedural default of Claim Three. Moreover, regardless of the path taken (considering Claim Three on the merits, via cause and prejudice, or Claim Seven's ineffective assistance of counsel claim) all reach the same result that this underlying claim is meritless. The discussion of the merits occurs in the Claim Seven analysis below.

(Dkt. 33-2.) nor to the state appellate court and state supreme court in post-conviction proceedings.[3] (Dkt. 33-7; Dkt. 33-9.)

### 5. Claims Five and Nine: Identification Procedures and Ineffective Assistance of Appellate Counsel.

Claims Five and Nine relate to Claim One regarding A.B.'s identification of Petitioner. Claim One raised an ineffective assistance of trial counsel claim for failing to move to suppress the identification. Claim Five now raises the underlying due process challenge to the identification and Claim Nine argues ineffective assistance of appellate counsel regarding the issue. (Dkt. 1, pgs. 7-8.) These claims were not properly raised on direct appeal. (Dkt. 33-2.) Both claims were raised in Petitioner's post-conviction petition, (Dkt. 33-5, pgs. 15, 37.) but neither was raised on post-conviction appeal. (Dkt. 33-7.) The claims are procedurally defaulted.[4]

### 6. Claim Six: Appellate Counsel's Failure to File Direct Appeal PLA.

Claim Six relates to Claims One and Two insofar as it asserts appellate counsel was ineffective in failing to present these claims to the Supreme Court of Illinois in a direct appeal PLA. (Dkt. 1, pg. 8.) Petitioner raised this claim in his post-conviction petition, (Dkt 33-5, pg. 17.) but it was not raised on post-conviction appeal. (Dkt. 33-7.) The claim is procedurally defaulted.

---

[3] Beyond the default, Claim Four is meritless. Evidentiary rulings raise non cognizable issues of state law and only implicate due process concerns if Petitioner can establish the incorrect evidentiary ruling was so prejudicial that it violated the constitutional right to a fundamentally fair trial, thereby rendering it likely an innocent person was convicted. *Perruquet v. Briley*, 390 F.3d 505, 510 (7th Cir. 2004); *Dressler v. McCaughtry*, 238 F.3d 908, 914 (7th Cir. 2001). Because of the strength of the evidence against Petitioner as a whole, the Court does not find admitting evidence of Petitioner's prior speeding ticket implicates a due process issue. The overwhelming nature of the evidence also means Petitioner cannot demonstrate prejudice for his *Strickland* argument in Claim Eight.

[4] Consistent with the analysis for Claim One, assuming for the sake of argument the claims were not defaulted, the underlying claims would nonetheless be meritless.

13

7.    **Claim Ten:   Ineffective Assistance of Appellate Counsel regarding Petitioner's Videotaped Statement.**

Petitioner's tenth claim argues appellate counsel was ineffective in failing to appeal the State's use of a videotaped statement of Petitioner at trial. (Dkt. 1, pgs. 8-9.) Petitioner gave the statement to police following his arrest. (Dkt. 37, pgs. 35-36.) This claim was not raised on direct appeal. (Dkt. 33-2.) Petitioner raised this issue in his *pro se* supplemental post-conviction petition, (Dkt. 33-5, pg. 62.) but the issue was not raised on post-conviction appeal. (Dkt. 33-7.) The claim is procedurally defaulted.

8.    **Cause and Prejudice and Fundamental Miscarriage of Justice**

Petitioner cannot excuse the procedural default of his claims through either cause and prejudice, nor fundamental miscarriage of justice. Procedural default may be excused if Petitioner can demonstrate either (1) cause for the default and prejudice or (2) that the failure to consider the claims will result in a fundamental miscarriage of justice. *See Coleman v. Thompson*, 501 U.S. 722, 724 (1991); *see also Weddington v. Zatecky,* 721 F.3d 456, 465 (7th Cir. 2013). With respect to the cause-and-prejudice test, cause is an "'objective factor, external to Petitioner that impeded his efforts to raise the claim in an earlier proceeding,'" and prejudice is "'an error which so infected the entire trial that the resulting conviction violates due process.'" *Weddington,* 721 F.3d at 465 (quoting *Smith v. McKee*, 596 F.3d 374, 382 (7th Cir. 2010)). Examples of cause include: (1) interference by officials making compliance impractical; (2) the factual or legal basis was not reasonably available to counsel; or (3) ineffective assistance of counsel. *Guest v. McCann*, 474 F.3d 926, 930 (7th Cir. 2007) (citing *McCleskey v. Zant*, 499 U.S. 467, 494-95 (1991)). The first two types of cause are not applicable to this case, and ineffective assistance of counsel does not excuse the default.

14

Petitioner argued in his petition and reply brief[5] that post-conviction appellate counsel was ineffective for failing to raise all claims asserted in his post-conviction petition. (Dkt. 1, pg. 9; Dkt. 35, pg. 7.) The assertion of ineffective assistance of counsel as a cause to excuse a procedural default is, itself, a constitutional claim that must be raised at each level of state court review. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Smith v. Gaetz*, 565 F.3d 346, 352 (7th Cir. 2009). Petitioner has not exhausted any ineffective assistance of counsel argument to excuse the default of his claims from his post-conviction petition.[6]

Moreover, ineffective assistance of counsel cannot constitute cause unless there is a constitutional right to counsel such that deprivation of the same violates the Sixth Amendment. *Coleman*, 501 U.S. at 752–53.[7] As there is no constitutional right to counsel during post-conviction proceedings, ineffective assistance of post-conviction counsel does not qualify as cause to excuse a procedural default. *Id.* at 725; *see also Davila v. Davis*, 137 S. Ct. 2058, 2062 (2017). Thus, Petitioner cannot demonstrate cause and prejudice to excuse the default.

---

[5] Petitioner filed three ancillary motions with his reply brief on August 7, 2020, one being a Motion for Judicial Review under the Miscarriage of Justice Exception. (Dkt. 35.) The Court dismissed the Motion to the extent it raised new claims that were not raised in Petitioner's initial petition. (Dkt. 40.) Although the Court maintains its original position that Petitioner cannot use the Motion as a vehicle to raise new claims that were not initially raised, the Court recognizes Petitioner may raise arguments that are responsive to any affirmative defenses asserted by Respondent. *See Hyson USA, Inc. v. Hyson 2U, Ltd.,* 821 F.3d 935, 939 (7th Cir. 2016) ("[A] plaintiff ordinarily need not anticipate and attempt to plead around affirmative defenses.") (citations omitted). Thus, this Court will consider Petitioner's Motion (as an extension of Petitioner's reply brief) to the extent it raises a cause and prejudice or miscarriage of justice argument in response to Respondent's affirmative defense of procedural default. (Dkt. 35, pg. 7-10.)

[6] Petitioner properly exhausted his ineffective assistance of appellate counsel claim as to the cross-examination of Reimann that he now raises in Claim Seven. This argument could also be used as cause for considering whether to exhaust the underlying claim as to Reimann's cross-examination in Claim Three. However, as explained below in Claim Seven, the ineffective assistance of counsel claim is meritless and, therefore, cannot be used as cause to excuse the default.

[7] In *Martinez v. Ryan*, 566 U.S. 1 (2012) and *Trevino v. Thaler*, 569 U.S. 413 (2013), the Supreme Court recognized narrow exceptions to the *Coleman* rule, whereby prisoners in certain states can use ineffective assistance of post-conviction counsel as cause to excuse a procedural default. The *Martinez-Trevino* exceptions, however, have not been extended to Illinois prisoners and, therefore, are not applicable to Petitioner's case. *Crutchfield v. Dennison*, 910 F.3d 968, 978 (7th Cir. 2018).

Petitioner's claim also does not implicate the fundamental miscarriage of justice (i.e., actual innocence) exception. To establish actual innocence, Petitioner must demonstrate that "in light of new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *McQuiggin v. Perkins*, 569 U.S. 383, 386–87 (2013) (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). This is a "demanding" and "seldom met" standard, *id.* (citing *House v. Bell*, 547 U.S. 518, 538 (2006), that requires presentation of "'new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'" *House*, 547 U.S. at 537 (quoting *Schlup*, 513 U.S. at 324); *see also McDowell v. Lemke,* 737 F.3d 476, 483–84 (7th Cir. 2013) ("evidence…[sufficient] to meet the actual innocence bar…is 'documentary, biological (DNA) or other powerful evidence: perhaps some non-relative who placed him out of the city, with credit card slips, photographs, and phone logs to back up the claim.'") (quoting *Hayes v. Battaglia,* 403 F.3d 935, 938 (7th Cir. 2005)).

Petitioner cannot meet this exacting standard. At the outset, the Court notes Petitioner provides no new evidence to demonstrate he is innocent. Additionally, the evidence at trial demonstrating his guilt is overwhelming.

A.B. witnessed Christa's murder and identified Petitioner from a photo lineup and in open court as the shooter. A.B. recognized Petitioner as someone he had seen at Michael and Christa's wedding, and he had traveled to Petitioner's apartment complex the day before the shooting occurred. During the photo lineup, the detective informed A.B. the lineup might not include a photograph of the suspect and he was not obligated to make an identification. Although A.B. identified the Petitioner as "Blizz," it is apparent that A.B. was mistaken as to the Petitioner's name, but otherwise consistent in his identification. When presented with a photo of Haynes, A.B.

16

confirmed he was not the shooter. Further, the interview exchange between Detective Heatherington and A.B. is countered by A.B.'s testimony that he saw the side of Petitioner's face and Detective Eissens' testimony that they never told A.B., "[we] got him" during the photo lineup.

Beyond A.B.'s identification, there was substantial evidence connecting Petitioner to the crime. Not only was Petitioner's cellphone left at the scene and used by the boy, but the Oldsmobile matching Peterson's description of the vehicle leaving the scene was found in his girlfriend's driveway with a piece of cardboard covering the license plate. Petitioner gave a statement to police admitting he went to the Clarks' home in the early morning hours on the day of the shooting, but claims Michael and Christa were murdered during the brief period of time between Petitioner leaving the residence and returning to retrieve his cellphone. Unsurprisingly, the jury disbelieved Petitioner's story that the victims were murdered during the short time he was outside their home. Other than describing the evidence as "coincidental" and "circumstantial," (Dkt. 35, pg. 8.) Petitioner does not offer anything more in support of his actual innocence argument. Consequently, Petitioner cannot excuse his procedurally defaulted claims.

### B. Claim Considered on Merits

#### 1. Claim Seven: Ineffective Assistance of Appellate Counsel as to Reimann Cross-Examination.

Claim Seven raises an ineffective assistance of counsel claim regarding the cross-examination of Reimann at trial. The Antiterrorism and Effective Death Penalty Act (AEDPA) governs review of the claim. The Court reviews the state post-conviction appellate opinion because that was the last state court to resolve the claim on the merits. *Harris v. Thompson*, 698 F.3d 609, 623 (7th Cir. 2012) (citing *Green v. Fisher*, 565 U.S. 34, 40 (2011)); *Garth v. Davis*, 470 F.3d 702, 710 (7th Cir. 2006).

17

Under the AEDPA, the Court may not grant habeas relief unless (1) the state court's decision on the merits was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or (2) the state court decision is based on an unreasonable determination of facts. 28 U.S.C. § 2554(d). The AEDPA standard is "difficult to meet," *Harrington v. Richter*, 562 U.S. 86, 102, as it is highly deferential to state court rulings and "demands that state court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)).

*Strickland v. Washington*, 466 U.S. 668 (1984), governs ineffective assistance of counsel claims and requires Petitioner to show both deficient performance by counsel and prejudice. *Id.* at 687. In applying the AEDPA to the *Strickland* analysis, this Court is required to afford an additional level of deference and latitude to the state court's determination than it does under the *Strickland* standard alone. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Our inquiry is not only whether counsel's performance fell below *Strickland*; rather, we are asked to determine whether the state court's application of *Strickland* was unreasonable—an additional hurdle. *Harrington,* 562 U.S. at 101. An unreasonable application of federal law means "objectively unreasonable, not merely wrong; even clear error will not suffice." *White v. Woodall*, 572 U.S. 415, 419 (2014) (internal quotations and citations omitted).

The state appellate court set forth and applied the controlling *Strickland* standard in its opinion, noting the two-prong test requires a showing that counsel's performance "fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Post-*

18

*Conviction Appeal*, 129 N.E.3d at 556 (quoting *Strickland*, 466 U.S. at 688). The court found counsel's decision not to challenge the trial court's limitation of the cross-examination of Reimann did not prejudice Petitioner within the meaning of *Strickland*, as the outcome on direct appeal would have been no different had the issue been raised. *Id.* at 558. We do not find this determination to be unreasonable.

When applying *Strickland's* two-prong analysis*,* the court need not analyze counsel's performance before addressing prejudice, nor does it need to address both prongs when there is an insufficient showing on one. *Strickland*, 466 U.S. at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id*. Under the prejudice prong, a "reasonable probability" is "'a probability sufficient to undermine the confidence in the outcome.'" *Blackmon v. Williams*, 823 F.3d 1088, 1105 (7th Cir. 2016) (quoting *Strickland*, 466 U.S. at 694). When assessing prejudice, a court must consider the evidence that would have been presented at trial, but for an attorney's deficient performance, along with the "the totality of the evidence before the . . . jury." *Strickland*, 466 U.S. at 695; *Blackmon*, 823 F.3d at 1106-07.

In this case, the state appellate court's decision rested largely on the prejudice prong. The court considered the evidence that would have been presented, namely Reimann's sentencing range, and found that it paled in comparison to the other evidence presented at trial. *Post-Conviction Appeal*, 129 N.E.3d at 557. For example, the court noted that even without testimony regarding Reimann's sentencing range, the jurors were aware of several issues concerning Reimann's credibility, such as the fact that he was facing a serious criminal charge when he spoke with the police and that he claimed to have no memory of his conversation with defendant before

proffering his trial testimony. *Id.* Further, the appellate court alludes to the trial court's wide latitude in determining the permissible scope of cross-examination, explaining that limitations placed on a defendant's cross-examination are "'harmless beyond a reasonable doubt'" where "'ample impeachment evidence is allowed.'" *Id.* (quoting *People v. Kegley*, 590 N.E.2d 922, 929 (Ill. App. Ct. 1992)). Given the other impeachment evidence allowed and the great amount of discretion afforded to the trial court in making these determinations, it was not unreasonable for the appellate court to find the outcome on direct appeal would have been no different had the claim been raised.

Beyond Reimann's testimony, the appellate court also considered the totality of the evidence as a whole, including A.B.'s identification of Petitioner as the shooter, A.B.'s use of Petitioner's cellphone that he left behind at the scene of the crime, and the discovery of the getaway car in Petitioner's girlfriend's driveway. *Id.* at 558. Regardless of whether knowledge of Reimann's sentencing range would have affected the jury's consideration of his testimony, the other evidence presented at trial weighed heavily against Petitioner. Thus, it was reasonable for the state court to conclude *Strickland*'s prejudice prong was not satisfied. Claim Seven is denied.[8]

## III.     Certificate of Appealability and Notice of Appeal Rights

The Court declines to issue a certificate of appealability. Under the AEDPA, a certificate of appealability "may not issue 'unless the applicant has made a substantial showing of the denial of a constitutional right.'" *Slack v. McDaniel*, 529 U.S. 473, 483 (2000) (quoting 28 U.S.C. § 2253(c)). This requires Petitioner demonstrate that reasonable jurists could debate whether this

---

[8] As discussed above, the ineffective assistance of counsel claim as to Reimann's cross-examination could serve as cause to excuse the default of Claim Three, but as explained in Claim Seven, the underlying merits of the ineffective assistance of counsel claim is meritless and, therefore, cannot excuse the default of Claim Three.

Court should have resolved Petitioner's claims differently or that the issues were "adequate to deserve encouragement to proceed further." *Arredondo v. Huibregtse,* 542 F.3d 1155, 1165 (7th Cir. 2008) (citing *Slack,* 529 U.S. at 484) (quoting *Barefoot v. Estelle,* 463 U.S. 880, 893 & n.4 (1983)). Petitioner cannot meet this standard.

Petitioner is advised that this is a final decision ending his case in this Court. If Petitioner wishes to appeal, he must file a notice of appeal with this Court within 30 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). Petitioner need not bring a motion to reconsider this Court's ruling to preserve his appellate rights. However, if Petitioner wishes the Court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. *See* Fed. R. Civ. P. 59(e). The time to file a motion pursuant to Rule 59(e) cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).

## IV.    Conclusion

Petitioner's habeas corpus petition (Dkt. 1.) is denied on the merits. Any other pending motions are denied as moot. The Court declines to issue a certificate of appealability. The Clerk is instructed to: (1) terminate Respondent Stephanie Dorethy and replace her with Petitioner's current

21

custodian, Dr. Deanna Brookhart, Warden, Lawrence Correctional Center; (2) alter the case caption to *Castillo v. Brookhart*; and (3) enter a judgment in favor of Respondent and against Petitioner. Civil Case Terminated.

ENTERED:

Dated: January 31, 2022

IAIN D. JOHNSTON
United States District Judge